## MARGARET McCUE v. STUMPF, Appellant.

Division One, March 17, 1904.

1. **FRAUDS: Obtaining Deeds.** Plaintiff's husband being indebted in the sum of $1,960 to a building and loan company, of which defendant's husband was the president, and being desirous of arranging his affairs before he died so as to make it as easy as possible for his wife to pay the debt, sent for defendant's husband, his most trusted friend, and stated he wanted the company to give his wife five years in which to pay the debt, and defendant's husband advised that he make a deed to his daughter and that she make one to his wife, and drew up deeds and returned when plaintiff's husband was very low, and had him and the daughter execute them, and retained them in his possession, and seven years later it developed that the first deed was to the daughter, but the one from her was to the company, and before plaintiff ascertained that fact the company through plaintiff's husband as president, after plaintiff had paid $920 on the debt, conveyed the lot to defendant. *Held*, that the deed should be set aside as a fraud, upon the payment by plaintiff of the balance due on the debt.

2. ———: **Accounting: Unrevealed Facts in Possession of Party.** Where one of the parties or his privy has it in his power to furnish accurate data for an accounting and does not do so, he can not complain of an allowance made to the other.

Appeal from Jackson Circuit Court.—*Hon. J. H. Slover*, Judge.

AFFIRMED.

*Elijah Robinson* for appellant.

(1) In an equity case this court will examine the evidence, and render such judgment as, in its opinion, should be rendered, regardless of the finding of the trial court. Sheridan v. Nation, 159 Mo. 27; Robertson v. Sheppard, 165 Mo. 360; Hoeller v. Haffner, 155 Mo. 589; Dunivan v. Dunivan, 157 Mo. 157; Blount v. Spratt, 113 Mo. 48; Lins v. Lenhardt, 127 Mo. 271; Warren v. Ritchie, 128 Mo. 311. (2) The only question for the consideration of this court is what was the amount of the indebtedness from Mr. McCue to Mr. Stumpf at the time of the execution of the deed in controversy, March 13, 1893. (3) The deeds in controversy, dated March 10th and acknowledged March 13, 1893, were fairly entered into, and there was not a particle of evidence in the case showing that they were procured by any false or fraudulent representations.

*Frank P. Walsh* and *E. R. Morrison* for respondent.

(1) In equity cases where the evidence is conflicting great weight has always been given by this court to the findings of fact of the trial judge who had an opportunity to observe the appearance and demeanor of the witnesses upon the stand. Mathis v. O'Neil, 94 Mo. 530; Taylor v. Crockett, 123 Mo. 300; Short v. Taylor, 137 Mo. 525; Parker v. Roberts, 116 Mo. 667. (2) Transactions between parties in intimate and confidential relations will be closely scrutinized, and the burden is cast upon one standing in such relation to show that no fraud or unfairness existed.

Leavitt v. La Force, 71 Mo. 353; Bogie v. Nolan, 96 Mo. 85; Hall v. Knappenberger, 97 Mo. 509; McClure v. Lewis, 72 Mo. 314; Bradshaw v. Yates, 67 Mo. 221. (3) Mrs. Stumpf being charged with fraud should have been put on the stand by appellant. Leeper v. Bates, 85 Mo. 224; Baldwin v. Whitcomb, 71 Mo. 658.

MARSHALL, J.—This is a bill in equity to cancel and set aside as fraudulent a certain deed to the north 55 feet of lot 9 of Seeger's addition to Kansas City, dated March 10, 1893, from Bridget McCue to the Aetna Building & Loan Company. The petition charges that the deed was executed by Bridget McCue to Margaret McCue, the plaintiff, and that the name of the plaintiff was subsequently fraudulently erased as the grantee and that of the Aetna Building & Loan Company substituted, but that the original deed is not in her possession or control, and that if upon the trial it turns out that she is mistaken as to such alteration, then she charges that the name of the Aetna Building & Loan Company was fraudulently put in the deed by George Stumpf, the husband of the defendant, and the president of that company, instead of the name of the plaintiff, as was intended and as Bridget McCue believed to be the fact when she executed the deed. The petition then charges that the Aetna Building & Loan Company on October 10, 1895, acting through said George Stumpf, conveyed the property to the defendant, Susie Stumpf. The prayer of the petition is that the title be divested out of the defendant and vested in the plantiff, and for a judgment for fifteen dollars a month rents and profits.

The defendant, Susie Stumpf, alleges that she holds the property as security for a note for $3,850, dated December 2, 1895, executed by the plaintiff; admits that she has collected certain rents, but claims she has paid out certain sums for taxes, insurance and repairs, and shows that she has a net balance of $190.83,

which should be credited on the note, and offers to convey the property to the plaintiff upon the payment of the balance due on the note with interest at six per cent, or the plaintiff failing so to do, she asks that the property be sold to pay said debt.

The reply admits that the plaintiff signed a note on December 2, 1895, for about $2,800, but alleges that George Stumpf represented to her that it was simply an extension of the indebtedness of her late husband to the Aetna Building & Loan Company, which was secured by deeds of trust on property in Wyandotte, Kansas, and had nothing to do with the property in controversy, and she says she never executed any instrument or acknowledgment of indebtedness to the defendant.

The trial court entered a decree for the plaintiff, and ordered the title vested in her upon payment by her to the defendant of $942.20. The defendant appealed. As there is no question of law involved, but the case hinges entirely upon the evidence, the facts will be stated in the course of the opinion.

On the 10th of March, 1893, William McCue owned the property in controversy, and also certain other property in Wyandotte, Kansas. He was very sick and expected to die. The property in Kansas was mortgaged. The Aetna Building & Loan Company held two mortgages for $1,400 each, although only $980 on each was actually borrowed, on lot 2 of block 1 of Welsh's subdivision, and on the southeast part of lot 10, block 1, Armstrong. And George Stumpf held a mortgage for $1,360 on lot 1 of block 1 of Welsh's subdivision. The property in controversy was free of incumbrance. George Stumpf was the personal friend of William McCue. Realizing that he had not very long to live, McCue sent for Stumpf and told him he wanted to arrange his affairs so that his wife would have an extension of five years time in which to pay what he owed on the property in Kansas. There is a sharp conflict in the

evidence as to what then followed. The plaintiff's evidence tends to show that Stumpf advised McCue to deed all his property to his sister, Bridget McCue, and have her deed it to his wife, the plaintiff, and thereby save the trouble and expense of an administration upon the estate. On the other hand Stumpf says he told McCue that if he would give the Aetna Building & Loan Company the property in dispute, as additional security, he would extend the time for the payment of McCue's indebtedness to the company for three years, and that to save the cost of administration he could deed the Kansas property that was already mortgaged to Bridget McCue and she could deed it to the plaintiff.

At any rate, Stumpf caused deeds to be prepared, and returned with a notary. These deeds conveyed the whole property from William McCue to Bridget McCue, and then the property in controversy was conveyed from Bridget McCue to the Aetna Building & Loan Company by a straight warranty deed, and without any mention of its being additional security. At the same time Bridget McCue conveyed the Kansas property to Margaret McCue, the plaintiff, which, of course, was subject to the mortgages thereon. The plaintiff and Bridget McCue swear that Stumpf told them that the deeds were to Margaret McCue, and neither one read them, and neither knew that the Aetna Building & Loan Company was the grantee in the deed to this property, but both relied on Mr. Stumpf's assurance that the deeds vested the title in Margaret McCoe, and she says she never heard that it did not do so, until August, 1900, when one McAnary told her that Mrs. Stumpf had a mortgage on the property in controversy, and that she immediately went to see Stumpf about it and he told her not to borrow trouble about her property, and that he would see that it was all right, and not to pay any attention to McAnary, and that she relied on his assurances. At the time the deeds were

executed, William McCue was very ill, and had to be held up while he signed them. He died shortly afterwards. Thereafter for more than seven years Stumpf attended to the property for Mrs. McCue, who was a woman of no business experience and entrusted everything to him so completely; she says, that she signed anything he told her to without reading it and without question. Stumpf says that in June or July, 1893, the Aetna Building & Loan Company commenced to wind up its affairs, and that he purchased the McCue mortgages that were held by the company. On October 22, 1895, the Aetna Building & Loan Company, acting through Stumpf, its president, conveyed the property in controversy to Susie Stumpf. The consideration was stated to be two thousand dollars. But in 1897, there was a judgment rendered against Stumpf for twenty thousand dollars, and his creditor sought to realize on it, and took the depositions of both Mr. and Mrs. Stumpf as to what interest they had in this property. At that time Mrs. Stumpf swore she had no interest in the property, and had given nothing for it, but that she held it simply as trustee for a lady whose name she did not exactly remember, but that it was ''Coal'' or Coon'' or something like that. Stumpf testified then that he had no interest in the property and his wife had no interest in it, but that it was held by his wife as security for what Mrs. McCue owed the Aetna Building & Loan Company, and that the amount had been fifteen hundred dollars, but had been reduced by a payment of nine hundred dollars to twelve hundred ˙ dollars, and that subject to such balance Mrs. McCue owned the property.

In this connection it is proper to anticipate the chronology of events so as to show what Mr. and Mrs. Stumpf said about it, on the hearing of this case on the 3d of August, 1901. Mrs. Stumpf said that Stumpf had transferred the property and Mrs. McCue's note for $3,850 to her in consideration of $3,500 worth

of stock in a bank which he had previously given her, and that he had used the stock in his business affairs. Stumpf says McCue owed the Aetna Building & Loan Company $1,960 with interest, and owed him personally $1,360 and interest, and that for the purpose of taking up the indebtedness he got his wife to let him have the bank stock and sold it and then he turned over the property from the company to her, as he did also the indebtedness of McCue it was intended to secure.

Thereafter, about the first of December, 1895, Stumpf tried to get Mrs. McCue to give Mrs. Stumpf some sort of a contract, but she refused to have any business with Mrs. Stumpf. Thereafter on December 5, 1895, Mrs. McCue said that Stumpf told her there would have to be an extension of the debt, and he told her there was about twenty-eight hundred dollars due, and he presented some papers to her to be signed saying that they were for such an extension, and that she signed them, without reading them, trusting to Stumpf's representations, and her daughter signed them as a witness. In reality the papers consisted of a note for $3,850 to Susie Stumpf, payable at three years, and an agreement or statement that she had given the note and reciting that if it was paid when due Mrs. Stumpf would quitclaim the property in controversy to Mrs. McCune. This was signed by Mr. and Mrs. Stumpf and by Mrs. McCue and her daughter. Stumpf then released the deeds of trust on the Kansas property.

Then Stumpf retained both the note and the contract, and Mrs. McCue never knew the nature of the contract until shortly before this suit was brought in August, 1900.

It is upon this showing that the chancellor ordered the title divested out of the defendant and vested in the plaintiff upon the payment by her of $942.20. The defendant says it is incomprehensible how the chancellor figured out such a sum. The plaintiff says the chancel-

lor allowed $1,960, the amount actually borrowed from the building company, and computed interest thereon from 1897, the date of Stumpf's testimony in the creditor's case against him, at which time he said neither he nor his wife had any interest in the property, and from this deducted $920 which was admittedly paid by Mrs. McCue on the debt in November, 1894, with six per cent interest, and also deducted $190.83, the net rents admitted by the defendant to be due and applicable to the debt, with six per cent interest, which left a balance of $942.20. The calculations have not been verified, but are assumed to be correct and to show the process employed by the chancellor in reaching the decree.

William McCue was dying. He owned the property in dispute and it was free of incumbrance. He owned property in Wyandotte, two lots of which were mortgaged to the Aetna Building & Loan Company, and one lot was mortgaged to Stumpf. These mortgages were made about the first of March, 1892. It does not appear when the notes would fall due. The controversy here involved occurred on March 10, 1893. The mortgages, especially those to the building company, were presumably not then due. McCue desired to arrange his affairs before he died, so as to make it as easy financially as possible for his wife after he passed into final sleep. He sent for George Stumpf, his best and most trusted friend, and explained what he desired, saying he wanted the building company to give his wife five years in which to pay what he owed the company. The preponderance of the evidence is that Stumpf agreed to fix it up as McCue wished, and that Stumpf advised that by deeding the property to Bridget McCue and by having her deed it to Mrs. McCue, the expense of administration could be saved and the matter arranged, and that he would prepare the deeds. He did prepare deeds and returned when McCue was very low, and had them executed, and told Mrs. McCue and Miss Bridget

McCue that the deeds vested the property here involved, as well as the Kansas property, in Mrs. McCue, the plaintiff. Stumpf retained the deeds, and McCue died, supposing his friend had carried out his wishes, and Stumpf acted for the widow as her friend for seven years afterwards, and during all that time neither Mrs. McCue nor Miss Bridget McCue ever suspected that the deeds were different from what Stumpf told them they were when they were executed.

In fact, the deeds were not as Stumpf represented. On the contrary while the deed to the Kansas property, which was mortgaged to the building company and to Stumpf, was made from Bridget McCue to Margaret McCue, the deed to the property in controversy was a warranty deed to the Aetna Building & Loan Company. In October, 1895, Stumpf, as president of the building company, conveyed the property to Mrs. Stumpf. When Mrs. McCue heard an intimation of this from outside parties in August, 1900, she went to Stumpf and asked him about it, and he told her not to borrow trouble, and he would see that it was all right and not to pay any attention to her informant.

It is true that this is not Stumpf's version of the matter. He says he told McCue the building company would not give Mrs. McCue five years in which to pay what he owed the company, but would give her three years if he would give the company this land as additional security. But even if this be the true agreement, Stumpf did not faithfully carry it out, for instead of making the deed as an additional security, Stumpf drew the deed as a straight warranty deed to the company. This was the first fraud he perpetrated in the matter, and it was a fraud upon his dying friend who trusted him, and upon women in the hour of their extreme distress.

But the learned chancellor evidently did not believe Stumpf's version was correct. And he was right in so doing, for it does not appear that McCue's indebted-

ness to the building company, which had only run a year, was then due or needed any extension, nor does it appear that the Kansas property was insufficient security for the debt it secured. Prima facie it was sufficient; else the building company would not have made the loan upon the faith of it.

In November, 1894, Mrs. McCue sold one of the Kansas lots on which the building company had a mortgage for $960, and paid the company $920 and the company released the land.

In October, 1895, Stumpf conveyed the land here involved to his wife. On December 5, 1895, under an assurance that it was necessary to extend the indebtedness to the building company, Stumpf procured Mrs. McCue to sign a note to Mrs. Stumpf for $3,850, payable at three years at six per cent interest, and also an agreement that if she paid the note when due, Mrs. Stumpf would quitclaim this property to Mrs. McCue.

Stumpf then had the mortgage on the other lot in the building company and also the mortgage he held against the third lot, released, and Stumpf kept the agreement as well as the note.

This was the second fraud Stumpf was guilty of, and it was against the widow of his dead friend, who trusted him implicitly, and was done immediately after Mrs. McCue had refused to have any dealings with Mrs. Stumpf. At the time it was done Mrs. McCue had never learned of the first fraud that Stumpf had perpetrated on her in not making the deed to this property to her, as he agreed to do, and represented that he was doing when the deed was signed.

At no time did Mr. McCue or Mrs. McCue owe the building company $3,850. The utmost that was borrowed from the company was $1,960, and of this $920 had been repaid in November, 1894. So that in any event the debt could have only been the interest on $1,960 from March, 1892, to November, 1894, and the balance of the $1,960 after deducting the payment of

$920, making $1,040, and with interest thereon from November, 1894, to December, 1895. In round numbers, this would amount on December 5, 1895, to $1,502.

If Stumpf's version be true, that this property was to be additional security for what McCue owed the building company, and if he was only providing for an extension of that debt, the note of December 5, 1895, ought to have been only for $1,502, and some small amount, not disclosed, which he says he had paid for taxes. Instead of so making it, Stumpf made the note for $3,850.

In order to make it that sum he says that McCue owed him $1,350 with interest, and owed the building company $1,960 with interest, less a payment of $900, and owed him seventy-one or one hundred and seventy-one dollars, and owed him a small amount for taxes that he had paid. But a simple calculation will easily show that it would not amount to $3,850.

For the balance due the building company was. .$ 1,502
The deed of trust to Stumpf on the Kansas lot,
   was for .............................. 1,350
Interest thereon from March, 1892, to December
   5, 1895, at 6 per cent, was................ 306
What McCue owed him was................. 171
                            ————
     Total ........................... ...........$ 3,329

The small amount due for taxes would therefore have to amount to $521 in order to bring it up to $3,850.

But even according to Stumpf's version, this property was never pledged as security for what was due to Stumpf. He had a deed of trust on lot 1 of block 1 of Welsh's subdivision in Wyandotte, Kansas, for $1,350 and interest, and no one ever authorized him to transfer his security for that debt from the Kansas property to the property here involved. Mrs. McCue never knew he had done so for five years after he had attempted by this means to do so.

Clearly this property is not chargeable with either the $1,350 and interest, or with the $171. No taxes are shown to have been paid by Stumpf on this property. So that even if all that Stumpf claims as to the original and only agreement that was made, be true, this property could only be liable for the balance due to the building company.

The only question remaining, therefore, is what was the true balance due the building company.

The court did not allow the defendant any interest prior to 1897, because at that time Stumpf and his wife both swore they had no interest in the property, but that it belonged to Mrs. McCue, subject to what she owed the building company, which Stumpf said was fifteen hundred dollars, less a payment of nine hundred and interest on the balance. This would make six hundred dollars with interest from November, 1894, which at six per cent to the date of the decree, on August 3, 1901, would make the total indebtedness $852. The chancellor allowed defendant $942.20. So that on this theory the defendant has no right to complain.

It will be observed that this does not take into account the possible fact that from March, 1892, to March, 1893, McCue paid interest and dues monthly to the building company, which is usual where such companies make loans, nor does it take into account the rents and profits of this property from March, 1893, to December, 1895, during which time Stumpf was handling it.

In view of all these circumstances the judgment of the circuit court was more favorable to the defendant than a full and accurate accounting might have entitled him to. The defendants Stumpf had it in their power to furnish accurate data for such an accounting and Stumpf's relation to the property and the parties required him to do so, but it was not done, and, therefore, if the allowance made by the circuit court is not as

large as Stumpf thinks it ought to be, he alone is to blame, and Mrs. Stumpf must bear the consequence.

For these reasons the judgment of the circuit court is affirmed. All concur.